PRESTON FIX AND WIFE, CARMEN J. FIX, CARL E. GROHS AND WIFE, BETTY R. GROHS, JAMES H. KENDRICK AND WIFE, JUDITH MARIE KENDRICK, AND RAYMOND C. SHARROW AND WIFE, VIRGINIA K. SHARROW, PETITIONERS v. CITY OF EDEN, RESPONDENT

No. COA04-1642

(Filed 20 December 2005)

**1. Cities and Towns— annexation—fire and water services— trial court findings—supported by evidence**

The evidence in an annexation case supported the trial court's findings about fire suppression services, maintenance of the insurance rating, and the need for booster pumps in water lines in the annexed area.

**2. Cities and Towns— annexation—extension of services— illusory statements—assumption that agreements would be reached**

The trial court properly concluded that an annexing city's statements about its commitment to extending waterlines were illusory. The city's master plan assumed (without providing a basis) that the city would be able to negotiate an agreement with the current water provider (Dan River).

**3. Cities and Towns— annexation—plan for extension of fire and water services—contingent—abstract—not sufficient**

The trial court did not err by concluding that an annexing city did not meet statutory requirements concerning the exten-

1

sion of municipal services where the city's plan for providing water and fire protection depended upon the doubtful contingency of reaching agreements with the current provider. Moreover, the city did not meet minimum statutory requirements in the information provided; a statement of intent alone is not sufficient. N.C.G.S. § 160A-47.

**4. Cities and Towns— annexation—noncompliance with statutory requirements—remand**

Where petitioners show that the degree of noncompliance with statutory requirements for annexation is so great as to eviscerate the protections provided in N.C.G.S. § 160A-47, a trial court does not err in declaring the ordinance null and void. However, the court must specifically find that the ordinance cannot be corrected on remand. The court here found only that the ordinance is not likely to be corrected on remand.

**5. Cities and Towns— annexation—actual use evidence—relevance—reliability**

The evidence supported the trial court's finding in an annexation case that petitioners' evidence about use and subdivision tests was of questionable relevance and that the city had used reasonably reliable methods in its calculation.

**6. Cities and Towns— annexation—use tests—split parcel—flawed data**

The question of whether a city had satisfied the use tests for annexation was remanded where the data relied on in compiling a table was flawed and a parcel was inappropriately split.

**7. Cities and Towns— annexation—recorded property lines not used—gap in annexed area avoided**

The trial court correctly determined that a city had substantially complied with N.C.G.S. § 160A-48(e) in an annexation where it used boundary lines along a river and creek rather than recorded property lines. There was evidence that the property lines would have left a gap between the city's current boundaries and the area to be annexed; the Legislature would not have intended a literal compliance with the statute that would leave such a gap.

**8. Cities and Towns— annexation—split parcel—degree of irregularity—remand**

An annexation was remanded for appropriate conclusions, including the court's determination of whether the inappropriate splitting of a parcel amounted to a "slight irregularity."

**9. Cities and Towns— annexation—plans for extending water and sewer lines—engineer's seal**

An annexing city substantially complied with the statutory requirement that maps showing the extension of water and sewer lines bear the seal of a professional engineer where the maps were both prepared by an engineering firm and were attached to a report to which an engineer affixed his or her seal, even though the maps themselves were not sealed.

Appeal by respondent from judgment entered 9 June 2004 by Judge Lindsay R. Davis, Jr. in Rockingham County Superior Court. Heard in the Court of Appeals 17 August 2005.

*Eldridge Law Firm, P.C., by James E. Eldridge, for petitioners-appellees.*

*Medlin Law Office, by Thomas E. Medlin, Jr., for respondent-appellant.*

CALABRIA, Judge.

The City of Eden (the "City") appeals from a judgment of the trial court declaring an annexation ordinance null and void. We remand to the trial court for proceedings not inconsistent with this opinion.

On 28 April 2003, the City of Eden adopted a resolution stating an intention to consider annexation of the Indian Hills area. The City adopted an annexation report on 14 May 2003 and an annexation ordinance on 22 September 2003. Fix, *et al.* ("petitioners") own real property in the Indian Hills area. Petitioners filed a petition in Rockingham County Superior Court on 8 September 2003 for review of the City's adoption of the annexation ordinance at issue. On 9 June 2004, Judge Davis entered findings of fact, conclusions of law, and judgment in favor of petitioners, declaring the City's annexation ordinance null and void. Respondent appeals.

I. The City's Assignments of Error

A. Findings Regarding the Necessity of the City having an Agreement with Dan River Water, Inc. ("Dan River")

**[1]** The City first challenges finding of fact 28, which states, "The undertaking to extend fire suppression services assumes the ability to negotiate with [Dan River] to install additional hydrants on existing [Dan River] lines." In annexation cases, "the findings of fact made below are binding on the Court of Appeals if supported by the evidence, even when there may be evidence to the contrary." *Barnhardt v. City of Kannapolis*, 116 N.C. App. 215, 217, 447 S.E.2d 471, 473 (1994).

We initially note that the trial court's finding of fact 23, which is not challenged on appeal, conclusively establishes that the current Indian Hill water service provider, Dan River, is federally protected. The following statute applies:

> (b) Curtailment or limitation of service prohibited
>
> The service provided or made available through any such association [federally indebted water associations] shall not be curtailed or limited by inclusion of the area served by such association within the boundaries of any municipal corporation or other public body, or by the granting of any private franchise for similar service within such area during the term of such loan; nor shall the happening of any such event be the basis of requiring such association to secure any franchise, license, or permit as a condition to continuing to serve the area served by the association at the time of the occurrence of such event.

7 U.S.C. § 1926(b) (2005).

Petitioners reference the following provision of the Comprehensive Water and Wastewater Master Plan ("Master Plan"), which assumes Dan River is federally protected, in order to show that the trial court's finding of fact 28 is supported by evidence:

> If the City opts to pursue annexation of the areas that Dan River is serving and the two parties cannot come to an agreement on a purchase plan, then the City will face a difficult problem. The City would be required to let Dan River continue to serve these areas but the City would be responsible for providing fire suppression. The City is obligated to provide fire suppression with its water system while Dan River Water System was not designed and is

not required to provide fire suppression. Therefore, the City would have very little choice but to bolster the portion of Dan River Water System within its then incorporated boundaries or install an extension of the City's system within these areas that is dedicated solely to fighting fires. Either option will require investment that would have to be offset with the benefits of revenues received from an increased tax base and wastewater service area.

The City argues that "[a]t most, [this] Court could find that the installation of additional hydrants assumes the ability to negotiate with [Dan River], but no evidence supports the finding that the entire 'undertaking to extend fire suppression services' requires such negotiation." We agree with the City that petitioners presented no evidence that the *only* way to go about extending fire suppression services was by adding additional hydrants. Indeed, the aforementioned provision of the Master Plan shows that fire suppression services could also have been maintained through a purchase agreement with Dan River, by "bolster[ing] the portion of Dan River Water System within its then incorporated boundaries[,] or [by installing] an extension of the City's system within these areas that is dedicated solely to fighting fires." Petitioners respond, however, that "[s]ince the City cannot compete with [Dan River], and did not address the feasibility of installing a dedicated suppression line, it elected to 'bolster' the existing lines within the annexation area through the installation of additional fire hydrants as shown on the City's water lines extension map." After reviewing the Annexation Utilities Study, stating "[f]ire hydrants are required at 600 foot intervals and must be connected to a minimum 6-inch water main" along with the Water System Improvements Annexation Area Map that included the proposed fire hydrants, we agree with the petitioners. We uphold the trial court's finding 28 because it conforms to the evidence that the particular method through which the City proposed to provide fire suppression services did indeed assume the ability to negotiate with Dan River.

The City next challenges finding of fact 29, which states, "The installation of the additional hydrants is necessary to obtain the same insurance rating (Class 4) for the Indian Hills Area as is applicable in the City." Finding 29 likewise is supported by the evidence. The record shows that the Indian Hills area is currently located in the Leaksville District, which has an insurance rating of class 9 and significantly higher insurance premium levels than in the City. Kelly Stultz ("Stultz"), planning director for the City, testified that the

**FIX v. CITY OF EDEN**

[175 N.C. App. 1 (2005)]

Indian Hills Area would drop to a class 4 rating with the installation of the additional hydrants:

Q. So the addition of those hydrants would bring the level of fire protection into this area on a level that was equal to what the rest of the city is receiving from the city fire department; is that correct?

A. Yes.

Q. And is that the basis for the anticipated lower ISO rating?

A. No. My understanding of the ISO rating is that it is much more than fire hydrants . . . .

Q. The fire hydrants are certainly part of that; is that correct?

A. Yes.

The City urges us to consider Fire Chief Ronnie Overby's ("Overby") testimony in reply to the question, "And the increase in hydrants is going to get the city its lower rating in the area?" Overby responded, "We already have a lower rating. The hydrants are not going to make any difference." Although there is some evidence to support contrary findings, the trial court's finding of fact 29 is binding on this Court because it is supported by evidence. *See Barnhardt*, 116 N.C. App. at 217, 447 S.E.2d at 473.

The City also challenges finding of fact 32, which states, "Within the Indian Hills Area, the flow rate in [Dan River's] water lines is less than the flow rate within the City's water lines such that the installation and use of booster pumps is necessary in order for the City to be able to provide the same level of fire suppression service within the annexed area." The City argues that "nothing was stated about booster pumps being needed." However, Brad Corcoran ("Corcoran") the city manager testified about information contained in the Master Plan as follows:

Q. And in order to provide the operating pressure in your water distribution system as it is in the rest of the town, you are going to be required to have booster pumping in that area, is that correct, in order to get the adequate pressures?

A. That's what this says, yes.

We are, accordingly, bound by the trial court's finding. *See Barnhardt*, 116 N.C. App. at 217, 447 S.E.2d at 473.

B. Conclusions of Law

[2] The City next challenges several of the trial court's conclusions of law. It first challenges conclusion of law 7 which states:

> 7. While the Report contains statements generally committing the City to provide water and fire protection and suppression services to the Indian Hills Area on substantially the same basis and in the same manner as such services are provided within the rest of the City prior to annexation, as required by [N.C. Gen. Stat.] § 160A-47(3)(a), Petitioners have shown that the City's general statements are illusory, for reasons including:
>
>   a. The City is prohibited from interfering with [Dan River's] business so long as federally guaranteed loans are in place (see 7 U.S.C. § 1926), thereby foreclosing competition and acquisition by eminent domain.
>
>   b. [Dan River] must agree to various proposals that the City could make to acquire supplement or connect to existing [Dan River] facilities, and no such agreement exists.

In regard to water services, the following findings are relevant:

> 13. With respect to extension of water services to the area to be annexed, the Report notes that both the City and [Dan River] provide "limited water services" to the area; that "[t]he extension of water . . . to the entire area will result in new lines being run to properties not already served by the City . . . "; that the extension of such services would be complete within two years of annexation; and that the net cost thereof would be $78,000, half of which would be assessed to residents.
>
> 14. [Dan River's] customers within the Indian Hills Area pay a higher rate for water service than the City charges its water service customers within the municipality.
>
> 15. No agreement exists between the City and [Dan River] that provides for how the City will subsidize [Dan River] for the revenue it will lose as a result of the lower rates the City will charge its water service customers within the Indian Hills Area.
>
> 16. If new City water service lines are constructed in the Indian Hills Area, or an agreement between the City and [Dan River]

concerning the City's acquisition or use of [Dan River's] lines is negotiated, the City will pay [Dan River] a yearly subsidy for the lost revenue resulting from the lower rates the City will charge for its water service. [In a footnote, the trial court notes, "The City also suggests, alternatively, that customers in the Indian Hills Area who continue to receive water services from [Dan River] at its higher rates could be 'reimbursed' by the City for the difference between [Dan River] rates and City rates, to meet the 'same basis' and 'same manner' requirements of N.C. Gen. Stat. § 160A-47(3)a."]

19. [Dan River] provides water service to all of Area 5 except "a small section of NC 770 from Matrimony Creek to Brammer Road," and the only water system improvements contemplated by the City are the addition of fire hydrants throughout the area "to maintain the City's required 600 foot spacing."

20. Among assumptions in the FBS report is that "the [Dan River] system could be modified and extended for the City's purposes."

21. The FBS report further states that "[a]n agreement must be negotiated between the City . . . and [Dan River] to provide water services to these customers."

22. No agreement exists between the City and [Dan River] concerning the City's use of or modifications to [Dan River's] water service lines in the Indian Hills Area, or otherwise to provide for additional water service in that area by the City or by [Dan River] under contract with the City.

23. [Dan River] is a rural water association, and a portion of its operating assets secures payment of a federally guaranteed loan.

The findings of fact regarding the lack of an agreement to subsidize Dan River, if taken alone, fail to support the trial court's conclusion of law 7; however, the findings regarding the extension of waterlines do adequately support conclusion 7. The City, in its report, proposed to continue using Dan River waterlines since the City is prohibited from competing with Dan River, but the City failed to reach an agreement with Dan River regarding a plan to subsidize Dan River for the lower prices that the annexed residents will be charged for water. The lack of an agreement to subsidize Dan River, however, fails to

FIX v. CITY OF EDEN

[175 N.C. App. 1 (2005)]

support the trial court's conclusion that the City's commitment to providing water services is illusory, given that the trial court found that the City could reimburse the customers directly.

The lack of an agreement regarding the extension of waterlines is more problematic. The report assumes, without providing any basis for the assumption, that the City will be able to negotiate an agreement with Dan River regarding the extension and use of Dan River's waterlines in order to reach part of the Indian Hills area that is not already serviced with water. If Dan River refuses to allow the City to use and extend its lines, that portion of the Indian Hills area which is currently without water may continue not to receive water services. In the absence of such an agreement, the City would have to arrange for more costly measures such as extending its own lines solely to service this area, since it cannot compete with areas already serviced by Dan River due to Dan River's protected status. As such, there should have been an agreement with Dan River or other concrete indication that such an agreement could be obtained prior to the creation of the report so that the report could set forth reasonably concrete information about the feasibility and costliness of extending water services and the governing board could make an informed decision about this matter with informed public comment. Rather, the report merely assumes that Dan River will grant such acceptance and does not address whether the City has the means to extend water services if Dan River fails to negotiate with them. Accordingly, in the absence of an agreement or analysis in the report discussing the feasibility and costliness of providing water services if Dan River refuses to bargain with the City, the trial court properly concluded that the City's statement regarding its commitment to provide water services is illusory.

Regarding fire suppression services, the trial court found:

27. The Report states that the City will extend its fire protection and fire suppression services into the Indian Hills area.

28. The undertaking to extend fire suppression services assumes the ability to negotiate with [Dan River] to install additional hydrants on existing [Dan River] lines.

29. The installation of the additional hydrants is necessary to obtain the same insurance rating (Class 4) for the Indian Hills Area as is applicable in the City.

30. The City has not complied with or implemented [Dan River's] water line extension policy with respect to installing the fire hydrants within the Indian Hills Area.

31. No agreement exists between the City and [Dan River] concerning installation of new hydrants.

32. Within the Indian Hills Area, the flow rate in [Dan River's] water lines is less than the flow rate within the City's water lines such that the installation and use of booster pumps is necessary in order for the City to be able to provide the same level of fire suppression service within the annexed area.

33. No agreement exists between the City and [Dan River] that provides for how the City will install or use the necessary booster pumps within the Indian Hills Area.

Likewise, the findings of fact support the trial court's conclusion that the City's statements regarding its commitment to provide fire protection and suppression services are illusory. The City's proposed plan required that it negotiate with Dan River regarding the installation of additional hydrants on Dan River's waterlines. If Dan River refuses to allow the installation of additional hydrants, the City would be unable to provide Indian Hill residents with the same insurance rating. The findings also state that booster pumps are necessary in order for the City to be able to provide a flow rate in [Dan River's] waterlines that is equivalent to the flow rate in the City waterlines and in order to provide an equivalent rate of fire suppression services; however, the City has no agreement with Dan River regarding the installation of booster pumps. Because the City failed to reach any agreement with Dan River regarding these matters, the trial court properly concluded that the City's statements regarding its commitment to fire protection and suppression services are illusory.

[3] The City next challenges conclusion of law number 8 which states, "The Report does not meet the requirements of [N.C. Gen. Stat.] § 160A-47(3)(a) and (b), pertaining to water service and fire suppression." The statute at issue in this case is N.C. Gen. Stat. § 160A-47 (2003), covering prerequisites to annexation. "The purpose of this statute is to insure that, in return for the financial burden of city taxes, annexed residents receive all major city services." *Parkwood Ass'n v. City of Durham*, 124 N.C. App. 603, 606, 478 S.E.2d 204, 206 (1996). "The requirements of the Act that plans for extension to the area to be annexed of all major municipal services

performed within the municipality at the time of annexation is a condition precedent to annexation." *In re Annexation Ordinance No. 1219 Adopted by City of Jacksonville, North Carolina, April 18, 1961*, 255 N.C. 633, 646-47, 122 S.E.2d 690, 700 (1961). "The minimum requirements of the [annexation] statute are that the City provide information which is necessary to allow the public and the courts to determine whether the municipality *has committed itself* to provide a nondiscriminatory level of service and to allow a reviewing court to determine after the fact whether the municipality has timely provided such services." *Cockrell v. City of Raleigh*, 306 N.C. 479, 484, 293 S.E.2d 770, 773 (1982) (emphasis added). However, while our Supreme Court has recognized that a city need only "substantially comply" with § 160A-47, *see Food Town Stores v. City of Salisbury*, 300 N.C. 21, 40, 265 S.E.2d 123, 135 (1980), it has also said a city is required to provide major municipal services under N.C. Gen. Stat. § 160A-47, and its performance of this duty "may not be made to depend upon a doubtful contingency." *In re Annexation Ordinance Adopted by City of Jacksonville*, 255 N.C. at 646, 122 S.E.2d at 700 (finding plans for extension of water and sewer services insufficient when they were purely conditional).

By statute, in pertinent part, the annexation report must contain

(3) A statement setting forth the plans of the municipality for extending to the area to be annexed each major municipal service performed within the municipality at the time of annexation. Specifically, such plans shall:

a. Provide for extending . . . fire protection . . . services to the area to be annexed *on the date of annexation* on substantially the same basis and in the same manner as such services are provided within the rest of the municipality prior to annexation. A contract with a rural fire department to provide fire protection shall be an acceptable method of providing fire protection. If a water distribution system is not available in the area to be annexed, the plans must call for reasonably effective fire protection services until such time as waterlines are made available in such area under existing municipal policies for the extension of waterlines. . . .

b. Provide for extension of major trunk water mains . . . into the area to be annexed so that when such lines are constructed, property owners in the area to be annexed

will be able to secure public water and sewer service, according to the policies in effect in such municipality for extending water . . . lines to individual lots or subdivisions. . . .

c. If extension of major trunk water mains . . . and water lines is necessary, set forth a proposed timetable for construction of such mains . . . and lines as soon as possible following the effective date of annexation. In any event, the plans shall call for construction to be completed within two years of the effective date of annexation.

N.C. Gen. Stat. § 160A-47(3) (2003) (emphasis added).

The trial court's findings of fact support its conclusion of law number 8 because a doubtful contingency is present. In order for the City to provide water and fire protection as it claims in its report, under its proposed plan for doing so as conclusively established through the findings of fact, it would have to reach several agreements with Dan River. The necessity of reaching these agreements creates a doubtful contingency such that the City is not in substantial compliance with N.C. Gen. Stat. § 160A-47(3). *See In re Annexation Ordinance Adopted by City of Jacksonville*, 255 N.C. at 646, 122 S.E.2d at 700. Moreover, the City has failed to meet even the "minimum requirements" of the annexation statute in that it has not "provide[d] information which is necessary to allow the public and the courts to determine whether the municipality *has committed itself* to provide a nondiscriminatory level of service." *See Cockrell*, 306 N.C. at 484, 293 S.E.2d at 773. Although the City has stated that it made such a commitment, a statement of intent alone is insufficient to meet the requirements of N.C. Gen. Stat. § 160A-47(3). Our Supreme Court has held that "the report of plans for extension of services is the cornerstone of the annexation procedure . . . and to be of greatest possible benefit, the plans for services should be stated as fully and in as much detail as resources of the municipality reasonably permit." *Cockrell*, 306 N.C. at 485, 293 S.E.2d at 774. In order to show a true commitment to the extension of municipal services, there must be more than mere words of commitment; rather, there must be reasonably concrete and feasible plans in place for the extension of municipal services. *See id.* On these facts, the degree of noncompliance was so great as to make the proposed plan meaningless. If merely stating an abstract intent to provide municipal services to the annexed area were sufficient to meet the statutory requirements, cities would be

able to adopt ordinances without sufficient information of the costliness of the annexation and the feasibility of providing municipal services. Citizens would be unable to participate on an informed basis in the public hearing and offer feedback to the City on the prudence of adopting an annexation ordinance. *See Parkwood Ass'n*, 124 N.C. App. at 612, 478 S.E.2d at 209 (recognizing that the accuracy of projected annexation costs and items contained in the report should be challenged in the public hearing). Accordingly, because the City had no reasonably concrete and feasible plans in place, we hold that the trial court did not err in concluding that the City had failed to comply with N.C. Gen. Stat. § 160A-47.

C. Declaration by the Trial Court that the Annexation Ordinance is Null and Void

**[4]** The City argues that the trial court erred in declaring the annexation ordinance null and void under the applicable statute, which states:

> The court may affirm the action of the governing board without change, or it may

> (1) Remand the ordinance to the municipal governing board for further proceedings if procedural irregularities are found to have materially prejudiced the substantive rights of any of the petitioners.

> (2) Remand the ordinance to the municipal governing board for amendment of the boundaries to conform to the provisions of [N.C. Gen. Stat.] 160A-48 if it finds that the provisions of [N.C. Gen. Stat.] 160A-48 have not been met; provided, that the court cannot remand the ordinance to the municipal governing board with directions to add area to the municipality which was not included in the notice of public hearing and not provided for in plans for service.

> (3) Remand the report to the municipal governing board for amendment of the plans for providing services to the end that the provisions of [N.C. Gen. Stat. 160A-47 are satisfied.]

> (4) Declare the ordinance null and void, if the court finds that the ordinance cannot be corrected by remand as provided in subdivisions (1), (2), or (3) of this subsection.

N.C. Gen. Stat. § 160A-50(g) (2003).

Specifically, the City argues that "[o]nly if the matter cannot be remanded and a Petitioner will suffer material injury by reason of the failure to comply with the statutes can the ordinance be declared null and void[,] [and] [t]he evidence and the findings do not support any material injury to the Petitioners." In response, the petitioners argue

The City . . . failed to substantially comply with an essential requirement of the annexation procedure when it failed to approve a Report that met the requirements of [N.C. Gen. Stat. § 160A-47(3)]. In failing to meet this procedural requirement, the City compromised the substantive rights of the Petitioners, and of any other entity having an interest in this annexation proceeding, to participate, on an informed basis and as effectively as possible, in the informational meeting and public hearing. The fact that the City's annexation ordinance was, on its first reading, adopted by the thinnest of margins on a 4 to 3 vote, suggests that, but for the material prejudice stemming from the City's noncompliance the ordinance may have been voted down.

Although N.C. Gen. Stat. § 160A-50(g) sets forth three grounds on which a trial court may remand an ordinance to the governing board, it does not require that the trial court remand the ordinance "if the court finds that the ordinance *cannot* be corrected by remand[.]" (Emphasis added.) The trial court in its findings of fact stated that "[t]he City's failure to meet [the requirements of § 160A-47] results in material injury to Petitioners which the Court concludes *is not likely* to be corrected if remanded." (Emphasis added.) North Carolina General Statutes § 160A-50(g) permits remand of an ordinance for certain degrees of noncompliance when irregularities do not eviscerate the protections provided in N.C. Gen. Stat. § 160A-47. Where petitioners show that the degree of noncompliance with statutory requirements for annexation is so great as to eviscerate the protections provided in N.C. Gen. Stat. § 160A-47, a trial court does not err in declaring an ordinance null and void. However, in order for a trial court to properly declare an ordinance null and void under § 160A-50(g)(4), it must specifically find that "the ordinance *cannot* be corrected by remand" as opposed to finding that "the ordinance is not likely to be corrected on remand." *See* N.C. Gen. Stat. § 160A-50(g)(4). Because the trial court failed to make the appropriate finding, perhaps acting under a misapprehension of applicable law, *see Nationwide Mut. Ins. Co. v. Chantos*, 298 N.C. 246, 252, 258 S.E.2d 334 (1979), we remand this matter to the

trial court for appropriate findings to support one of the statutory grounds under N.C. Gen. Stat. § 160A-50(g).

II. Cross-Assignments of Error by Petitioners

A. North Carolina General Statutes 160A-48(c)(3) (2003)

[5] Petitioners raise several assignments of error on appeal. Petitioners first argue that "the evidence does not support the findings of fact and conclusions of law that the Indian Hills Area met the subdivision requirement of [N.C. Gen. Stat.] 160A-48(c)(3) and that the city used reasonably reliable methods in determining the degree of subdivision." Of numerous findings of fact on this issue, petitioners only assign error to and argue in their brief finding 40. Finding 40 states,

> 40. The "actual use" evidence reflected in Pet. Exh. 27 is of questionable relevancy because the observations on which it is based were not as of the date of the Report or the Second Annexation Ordinance. The City and its contractor, the COG, used City data, supplemented by Geographic Information System (GIS) data and limited on-site observation by COG personnel, to apply the use and subdivision tests. Such sources are reasonably reliable, and Petitioners have not carried their burden of proof to the contrary.

As stated *supra*, on review of an annexation ordinance, findings of fact made below are binding on this Court if supported by evidence, even though there is evidence to the contrary. *Barnhardt*, 116 N.C. App. at 217, 447 S.E.2d at 473. Kandas Burnett ("Burnett"), petitioner's witness, testified that she had modified the City's "use" spreadsheet, and she acknowledged that the modified spreadsheet was petitioner's exhibit 27. Burnett further testified that she had gone out to observe the property and determine its uses the day prior to the hearing on this matter, 9 May 2004. Because this evidence supports the trial court's basis for finding petitioner's exhibit was "of questionable relevancy," that portion of the finding is conclusively established.

Likewise, evidence supports the portion of the finding that relates to the reliability of the City's evidence regarding the use and subdivision tests. Johanna Cockburn ("Cockburn"), a witness for the City, testified that she served as a senior planner at the Piedmont Triad Council of Governments and that her duties included, *inter*

**FIX v. CITY OF EDEN**

[175 N.C. App. 1 (2005)]

*alia,* "transportation planning, land use planning, assistance with zoning, [and] annexation feasibility studies." She further testified that the methodology she used in preparing her calculations included digital data from Rockingham County's website in the place of actual hardcopy tax cards, a CD Rom that contained maps and drawings from GIS files, and property values. Additionally, she testified that the Piedmont Triad Council of Governments had been using GIS data "for the better part of ten years" and "[f]or area calculations, in particular, in association with annexations . . . for at least the last five or six." Accordingly, because evidence supports the trial court's finding 40, it is conclusively established.

**[6]** Having determined that finding 40 is conclusively established, we next turn to petitioner's challenge of conclusion of law 6, which states: "The City has substantially complied with the requirements of [N.C. Gen. Stat.] § 160A-48(c)(3) regarding development for urban purposes and satisfaction of the use and subdivision tests." North Carolina General Statutes § 160A-48(c)(3) requires that:

> (c) Part or all of the area to be annexed must be developed for urban purposes at the time of approval of the report provided for in G.S. 160A-47. . . . An area developed for urban purposes is defined as any area which meets any one of the following standards: . . .

> (3) Is so developed that at least sixty percent (60%) of the total number of lots and tracts in the area at the time of annexation are used for residential, commercial, industrial, institutional or governmental purposes, and is subdivided into lots and tracts such that at least sixty (60%) of the total acreage, not counting the acreage used at the time of annexation for commercial, industrial, governmental or institutional purposes, consists of lots and tracts three acres or less in size. . . .

N.C. Gen. Stat. § 160A-54 (2003) provides that:

> In determining . . . degree of land subdivision for purposes of meeting the requirements of G.S. 160A-48, the municipality shall use methods calculated to provide reasonably accurate results. In determining whether the standards set forth in G.S. 160A-48 have been met on appeal to the superior court under G.S. 160A-50, the reviewing court shall accept the estimates of the municipality unless the actual . . . degree of land subdivision falls below the standards in G.S. 160A-48: . . .

(3) As to degree of land subdivision, if the estimates are based on an actual survey, or on county tax maps or records, or on aerial photographs, or on some other reasonably reliable source, unless the petitioners on appeal show that such estimates are in error in the amount of five percent (5%) or more.

Findings of fact 34-35, 37-39, and 40, which relate to the "use" and "subdivision" requirements of the statute, support this conclusion of law. The findings state, *inter alia,* the following. The trial court found that "the area to be annexed 'is developed for urban purposes because it meets both the use and subdivision tests.' " The trial court also found that the City report contained a table that summarized the compliance criteria to include: 149 parcels; 68.4% of the parcels in use; 153.1 acres of total residential/undeveloped acreage; and 63.2% of residential/undeveloped acreage was subdivided into lots of three acres or less. Attached to its report was a spreadsheet marked petitioner's exhibit 5. Exhibit 5 was initially described by the City as the data compilation on which the report was based, but it was later determined that the correct compilation was defendant's exhibit 17. The trial court made the additional finding that although petitioners presented evidence showing the inaccuracy of the City's data, the court discounted petitioners' evidence "because the observations on which it is based were not as of the date of the Report of the Second Annexation Ordinance." Lastly, the trial court found that the City used reasonably reliable methods.

While these findings support the trial court's conclusion of law 6, we look at the findings as a whole. Two footnotes in the trial court's judgment must also be taken into consideration:

5. Unfortunately, Def. Exh. 17 contains several inaccuracies. . . . Second, only 12,500 square feet of . . . (parcel 1350) . . . should have been included. The metes and bounds description in the Second Annexation Ordinance and a map of "Indian Hills Annexation Area" dated June 27, 2003, . . . which is Pet. Exh. 1, include only a portion of the parcel, but Pet. Exh. 5 and Def. Exh. 17 erroneously include the whole parcel. The deletion of the balance of the area of parcel 1350, or 1,133,999.54 square feet, significantly reduces the size of the total area to be annexed (and significantly improves the City's qualification under the subdivision test).

6. By the evidence presented and its submission of proposed findings of fact and conclusions of law as requested by the

Court, the City concedes that the "splitting" of parcel 1350 (which actually should be parcel 6602) is not appropriate and that either all or none of the parcel should be included in the area to be annexed. The City may address that question if the proposed annexation is revisited.

Since the data underlying the table presented in the report was flawed, it stands to reason that depending on whether the parcel is ultimately included or excluded from final calculations, it may have some bearing on whether the City has met the statutory requirements regarding development for urban purposes and satisfaction of the use and subdivision tests. Alternatively, the inclusion or exclusion of this parcel may have little bearing on whether the statutory requirements are met. We have no information in the record from which we can determine this matter, and, therefore, remand it to the trial court for its consideration.

B. North Carolina General Statutes § 160A-48(e)

[7] Next, petitioners argue that "the evidence does not support the findings of fact and conclusions of law that the city met the mandatory requirements of [N.C. Gen. Stat.] § 160A-48(e)." Although petitioners argue in part that the evidence does not support the findings of fact, we note petitioners failed to assign error to the findings, and the findings are thus conclusively established. We, therefore, consider only whether the trial court's findings of fact support its conclusion of law 4, which states:

Although the City described a portion of the boundary of the area to be annexed along Matrimony Creek by reference to the courses of the creek and the Dan River, rather than by reference to existing property lines and streets, as N.C.G.S. § 160A-48(e) provides, the noncompliance was insubstantial (and, in any event, could be cured if the City were to initiate annexation in the future).

North Carolina General Statutes § 160A-48(e) requires, in pertinent part, that: "In fixing new municipal boundaries, a municipal governing board *shall* use recorded property lines and streets as boundaries[.]" Petitioners argue that this requirement is mandatory under *Arquila v. City of Salisbury*, 136 N.C. App. 24, 523 S.E.2d 155 (1999). In *Arquila*, a panel of this Court interpreted the language of an earlier version of § 160A-48(e), which said, whenever practical, a municipal governing board must follow "natural topographic features such as ridge lines and streams and creeks as boundaries, and

may use streets as boundaries." N.C. Gen. Stat. § 160A-48(e) (1994). This Court held " 'While section 160A-48(e) does not provide mandatory standards or requirements for annexation,' we believe that the provision itself is mandatory in light of our Supreme Court's holding that a boundary 'must' follow topographic features unless to do so would defeat the annexation." *Arquila*, 136 N.C. App. at 41, 523 S.E.2d at 167.

"An important function of statutory construction is to ensure accomplishment of the legislative intent." *Union Carbide Corp. v. Offerman*, 351 N.C. 310, 315, 526 S.E.2d 167, 170 (2000) (citations omitted). Accordingly, we first look to the words chosen by the legislature and "if they are clear and unambiguous within the context of the statute, they are to be given their plain and ordinary meanings." *Brown v. Flowe*, 349 N.C. 520, 522, 507 S.E.2d 894, 896 (1998). Our legislature, in enacting the current version of N.C. Gen. Stat. § 160A-48(e) (2005), removed the "whenever practical" language of the previous versions of the statute and used the word "shall." As such, the plain language of the statute establishes that § 160A-48(e) is a mandatory provision. However, we look not only to the provision at issue but also to the statutory scheme as a whole and to our prior interpretations of the statutory framework. Our Supreme Court has recognized that

It is generally held that slight irregularities will not invalidate annexation proceedings if there has been substantial compliance with all essential provisions of the law. Absolute and literal compliance with a statute enacted describing the conditions of annexation is unnecessary; substantial compliance only is required. . . . The reason is clear. Absolute and literal compliance with the statute would result in defeating the purpose of the statute in situations in which no one has been or could be misled.

*In re Annexation Ordinance Adopted by the City of New Bern, North Carolina, December 19, 1969*, 278 N.C. 641, 648, 180 S.E.2d 851, 856 (1971) (citations omitted).

The trial court made the finding that "[t]he legal description of the Indian Hills Area contains boundary lines that follow the course of the Dan River and Matrimony Creek instead of using recorded property lines." In regard to the use of boundary lines that follow the course of Dan River and Matrimony Creek, the City argues that

[t]he pre-annexation boundary line for the City ran with the meanderings of Matrimony Creek and this portion of the bound-

ary coincides with a portion of the area to be annexed. If the property lines along the bank of the creek for the Indian Hills Subdivision had been used, then there would have been a "gap" from the center of the creek to the west bank of the creek which would not have been annexed.

It is not our belief that the legislature would have intended literal compliance with the statute such that a "gap" would be left between the City's current boundaries and the area of land to be annexed. Accordingly, we hold that the trial court correctly determined that the City had substantially complied on this matter.

[8] Petitioners also assign error to the trial court's failure to conclude that "the City failed to comply with the requirements of [N.C. Gen. Stat.] § 160A-48(e) in that it failed to use the recorded property lines of lot number 6602." The trial court found "the City concedes that the 'splitting' of parcel 1350 (which actually should be parcel 6602) is not appropriate and that either all or none of that parcel should be included in the area to be annexed." Footnote 5 of the trial court's judgment shows the great variance in the total land that would have been annexed if parcel 1350 had not been split: "only 12,500 square feet of [parcel 1350] should have been included" . . . and the balance of land which should not have been included equaled "1,133,999.54 square feet." We agree that the trial court may have erred in not concluding that the City failed to comply with the mandatory provision of N.C. Gen. Stat. § 160A-48(e). We remand this issue to the trial court for appropriate conclusions of law, including its determination whether or not this nonconformity amounted to a "slight irregularit[y]" in regard to the annexation at issue.

C.  North Carolina General Statutes § 160A-47(1)b

[9] Lastly petitioners argue that "the evidence does not support the conclusion of law that the city met the requirements of [N.C. Gen. Stat.] § 160A-47(1)b with respect to the water and sewer line extension maps which were included with the report." Because no findings of fact on this matter are challenged, we take them as true and look only to whether the findings support the trial court's conclusion of law 2, which states

> While the maps showing the extensions of the water and sewer lines which were included with the Report did not bear the seal of a registered professional engineer, the report to which such maps were appended did bear such seal, and the City has substantially complied with [N.C. Gen. Stat.] § 160A-47(1)b.

**FIX v. CITY OF EDEN**

[175 N.C. App. 1 (2005)]

The following findings of fact are relevant:

17. The Report does not include a "map or maps" bearing the seal of a registered professional engineer, showing existing and proposed extensions of trunk water mains in the Indian Hills Area (see N.C.G.S. § 160A-47(1)b), but does include an "Annexation Utilities Study of City of Eden" prepared by Finkbeiner, Pettis & Strout, Inc. (the FBS report), which bears the seal of a registered professional engineer, and which contains a map entitled "Figure 5 Water System Improvements Annexation Area 5" (Area 5 Water map), that purports to depict the location of existing City 12-inch and 6-inch lines, but not the location of any extensions thereof.

18. Area 5 is described in the FBS report as "the area in and around the Indian Hills subdivision."

25. The Report does not include a "map or maps" bearing the seal of a registered professional engineer, showing existing sewer interceptors and outfalls and proposed extensions of outfalls in the Indian Hills Area (see N.C.G.S. § 160A-47(1)b), but the FBS report contains a map entitled "Figure 6 Sewer System Improvements Annexation Area 5" (Area 5 Sewer map), that purports to depict the location of an existing City pump station, force main and gravity sewer, and of proposed gravity sewer extensions.

As stated *supra*, in assessing small nonconformities in annexation proceedings, our Supreme Court has said that "[i]t is generally held that slight irregularities will not invalidate annexation proceedings if there has been substantial compliance with all essential provisions of the law." *In re Annexation Ordinance Adopted by the City of New Bern*, 278 N.C. at 648, 180 S.E.2d at 856. The City substantially complied with the statutory requirement because the maps were both prepared by an engineering firm and attached to a report to which an engineer affixed his or her seal. As such, we reject petitioners' assignment of error.

D. Other Assignments of Error

We lastly note that petitioners' cross-assignments of error contain five assignments of error, numbers 3-6 and 17, regarding the trial court's *failure* to make certain findings of fact. On appeal, "a trial court's findings of fact in a bench trial have the force of a jury verdict and are conclusive on appeal if there is competent evidence to sup-

port them, even though [] there may be evidence that would support findings to the contrary." *Biemann and Rowell Co. v. Donohoe Companies, Inc.*, 147 N.C. App. 239, 242, 556 S.E.2d 1, 4 (2001). We have considered these assignments of error and find them to be without merit.

Remanded.

Judges ELMORE and GEER concur.